**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| DOUGLAS MASTRIANO, | : | CIVIL NO. 5:24-cv-00567-F |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES GREGORY, III, *et al.* | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT KUHN'S MOTION TO DISMISS SECOND AMENDED COMPLAINT AND BRIEF IN SUPPORT</u>

NOW COMES Plaintiff DOUGLAS MASTRIANO, by and through his attorney, Daniel L. Cox, The Cox Law Center, LLC, and opposes Defendant ROLAND KUHN's motion to dismiss and brief in support, filing this Response in Opposition and Brief in Support, requesting denial of Defendant's motion.

**The Cox Law Center, LLC**
By:
_____//s//_____
Daniel L. Cox, OKWD Bar 2490
Attorney for Plaintiff
The Cox Law Center, LLC
P.O. Box 545
Emmitsburg, MD 21727
Ph: 410-254-7000
Fx: 410-254-7220
E-mail: dcox@coxlawcenter.com

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................... 4

I.    INTRODUCTION ................................................................. 6

II.    STATEMENT OF FACTS ....................................................... 7

III.    STANDARD OF REVIEW ...................................................... 12

IV.    ARGUMENT ....................................................................... 13

A.    This Court Has Proper Personal Jurisdiction Over Defendant Kuhn........... 13

1.    Kuhn Purposefully Directed Tortious Conduct Towards the United States
and Oklahoma...................................................................... 14

2.    Exercising Jurisdiction Over Kuhn Comports with Due Process. ............ 16

3.    Col. Mastriano's Co-Conspiratory Theory Independently Supports
Jurisdiction......................................................................... 17

4.    RICO's "Ends of Justice" Standard Confers Jurisdiction........................ 18

B.    Col. Mastriano Has Standing to Pursue Claims Under RICO and the
Sherman Act......................................................................... 20

1.    Concrete Injury to Business and Property are Asserted. ........................ 21

2.    Col. Mastriano's Injuries are Directly Traceable to Kuhn's Conduct. ...... 22

3.    The Injuries Suffered Are Redressable................................................. 23

C.    The Second Amended Complaint Properly Pleads RICO and RICO Conspiracy Claims. ................................................................................ 25

1.    The Second Amended Complaint Adequately Alleges a Pattern of Racketeering Activity. ............................................................................. 25

D.    The Second Amended Complaint States a Viable Claim Under § 1 of the Sherman Act. ......................................................................................... 28

1.    Using Fraud to Eliminate Competition is Anti-Competitive Conduct. .... 29

2.    Col. Mastriano Suffered an Antitrust Injury. .......................................... 30

1.    Kuhn's Statements are Actionable and Not Protected by the OCPA. ....... 31

2.    Col. Mastriano's Defamation Allegations are Sufficient. ......................... 32

3.    Col. Mastriano's False Light Claim Independently Survives. ................... 35

F.    Dismissal With Prejudice Would be Improper. ........................................... 38

V.    CONCLUSION ...................................................................................... 40

VI.    CERTIFICATE OF SERVICE ................................................................ 40

## TABLE OF AUTHORITIES

*Cases*

*Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210 (10th Cir. 2007)……..……………...…............12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................12

*Boyle v. United States*, 556 U.S. 938 (2009) ........................................................................27

*Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144 (10th Cir. 1998) .....................28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............………………21, 30

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .................................................16

*Bylin v. Billings*, 568 F.3d 1224 (10th Cir. 2009) .........................................................39

*Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245 (1974) .............................................37

*Cory v. Aztec Steel Building, Inc.*, 468 F.3d 1226 (10th Cir. 2006) .............................19

*Dental Dynamics v. Jolly Dental Group LLC*, 946 F.3d 1223, 1229 (10th Cir. 2020) ...............17

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008) .......................14

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) .........................................................23

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..........................................14

*Klein v. Cornelius*, 786 F.3d 1310 (10th Cir. 2015) ..................................................17

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .........................................................25

*Melea, Ltd. v. Jawer SA*, 511 F.3d 1060 (10th Cir. 2007) .............................................18

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ..................................................33

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) .........................................................28

*Robbins v. Wilkie*, 300 F.3d 1208 (10th Cir. 2002) ..................................................13

*Salinas v. United States*, 522 U.S. 52 (1997) .....................................................22, 26

*Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006) .............................................21, 27, 29

*XMission, L.C. v. Fluent LLC*, 955 F.3d 833 (10th Cir. 2020) .....................................14

4

*Yates v. Gannett Co., Inc.*, 523 P.3d 69 (Okla. Civ. App. 2022) ...............................................33, 36

## Statutes

12 O.S. § 1432(A) ................................................................................................................32

15 U.S.C. § 1 ......................................................................................................................29

15 U.S.C. § 15(a) ...............................................................................................................21

18 U.S.C. § 1961(1) ...........................................................................................................18

18 U.S.C. § 1962(c) ...........................................................................................................21

18 U.S.C. § 1964(c) ...........................................................................................................25

18 U.S.C. § 1965(b) ...........................................................................................................26

18 U.S.C. §§ 1341 ..............................................................................................................28

18 U.S.C. §§ 1343 ..............................................................................................................28

28 U.S.C. § 1367 ................................................................................................................36

## Rules

Fed. R. Civ. P. 9(b) ...........................................................................................................27

Fed. R. Civ. P. 12(b)(2) .................................................................................................13, 18

Fed. R. Civ. P. 12(b)(6) ........................................................................................6, 7, 12, 13

Fed. R. Civ. P. 15(a)(2) ...................................................................................................38-39

## Other Authorities

Restatement (Second) of Torts § 652D cmt. a .................................................................. 36

Restatement (Second) of Torts § 652E cmt. c .................................................................. 37

## I.    INTRODUCTION

Defendant Roland Kuhn's ("Kuhn") Motion to Dismiss the Second Amended Complaint reprises the same flawed arguments this Court has already seen in connection with other defendants' motions to dismiss: that Plaintiff Douglas Mastriano's claims are extraterritorial, speculative, or legally insufficient. The Second Amended Complaint now provides detailed factual allegations, including specific dates, wire communications, fraudulent statements, and documented economic injuries, The amended complaint satisfies each element of all challenged counts under Rule 12(b)(6) and the controlling law of this Court.

Dr. Kuhn is not an innocent bystander drawn inadvertently into litigation. As the Second Amended Complaint details, he is a Canadian academic who knowingly injected himself into a coordinated campaign targeting Col. Mastriano's professional standing, academic credentials, and political career. Kuhn published a fraudulent article titled "The Douglas Mastriano scandal" in the online journal *Canadian Perspectives on Academic Integrity* on July 31, 2023. This is a journal accessible across the United States. Kuhn presented a case study at the Canadian Symposium on Academic Integrity designed to validate and amplify these false allegations of academic misconduct against Col. Mastriano. These acts were not undertaken in isolation. They were coordinated with co-conspirators, including Defendant Gregory, an Oklahoma resident, and served the enterprise'' purpose of destroying

6

Col. Mastriano's reputation at a time when he was a leading candidate for the United States Senate in Pennsylvania.

Kuhn's motion rests principally on two pillars. First, a personal jurisdiction argument asserting that because his physical activities occurred in Canada, they had no relevance to Oklahoma; and second, substantive arguments asserting that even if he is subject to this Court's jurisdiction, his conduct does not constitute RICO violations, Sherman Act violations, or defamation.

Kuhn ignores RICO's nationwide service of process provision and the established Tenth Circuit framework that permits the "ends of justice" to confer jurisdiction over foreign co-conspirators when at least one defendant is subject to jurisdiction in the forum. The Second Amended Complaint plainly alleges such facts. On the merits, Kuhn mischaracterizes the allegations by isolating individual acts and stripping them of conspiratorial context, a method of argument courts in this Circuit have consistently rejected at the Rule 12(b)(6) stage. The Second Amended Complaint pleads far more than Kuhn acknowledges. Defendant Kuhn's Motion to Dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

The Second Amended Complaint alleges a multi-year coordinated campaign by Gregory and his co-defendants to destroy Mastriano's academic reputation, book

market, speaking career, and political viability. The following facts, which the Court must accept as true at this stage, are critical to this allegation.

Beginning in or about 2019, Defendant James Gregory III ("Gregory") initiated a coordinated scheme to destroy Col. Mastriano's academic credibility and market position. Gregory filed a false and fraudulent complaint with the University of New Brunswick ("UNB") challenging the integrity of Col. Mastriano's PhD thesis. UNB dismissed this initial complaint as substantively without merit.

In or about July 2022, UNB released Col. Mastriano's previously embargoed PhD thesis without his consent, violating his privacy rights. Gregory used this improperly released thesis to file a second complaint with UNB in or about October 2022, which was timed to coincide with Col. Mastriano's gubernatorial campaign, falsely claiming he had identified 213 problems in the thesis. Gregory made these allegations public, including through statements to major media outlets such as *The Independent*, characterizing Col. Mastriano's citations as "fraudulent" and his research as misconduct.

UNB and its officials, including President Paul Mazerolle, Vice-President David MaGee, and others, joined with Gregory's campaign by opening sham investigations into Col. Mastriano's thesis, making public statements validating Gregory's false allegations, and coordinating with Gregory to maximize reputational

8

harm. These actions were timed to correspond with Col. Mastriano's gubernatorial campaign in 2022 and his frontrunner status for the U.S. Senate in 2023-

In 2023, with Col. Mastriano's Senate candidacy at its height, the enterprise reopened a previously closed investigation into Col. Mastriano's thesis, appointed a new "investigation committee," and continued its coordinated public campaign against him. Multiple defendants communicated through email and other wired channels in furtherance of this scheme. As a direct result, publishers notified Col. Mastriano they would cease printing his books, speaking engagements were cancelled, media and film contracts in negotiation were terminated, and his Senate campaign was damaged by the weaponization of these false allegations.

Defendant Roland Kuhn is a Canadian academic who, at the time of the relevant conduct, was employed as a Principal Research Officer at the National Research Council of Canada (NRC) in Ottawa, Ontario. Kuhn serves on PhD committees and presents himself publicly as an expert in academic integrity. In June 2023, at the height of Col. Mastriano's U.S. Senate frontrunner status, Kuhn used a Canadian Symposium for Academic Integrity to scheme with UNB to fraudulently reopen a closed investigation into Col. Mastriano's PhD. At this symposium, Kuhn delivered a presentation in which he falsely characterized Gregory as a "respected historian" who had "found multiple instances of fraud" in Col. Mastriano's thesis. Kuhn falsely asserted that UNB had awarded Col. Mastriano's PhD under "unusual

9

circumstances," implying impropriety in the credentialing process. He made the malicious false statement that Col. Mastriano was a "participant in . . . an invasion of the U.S. Capitol." One of the members subsequently appointed to UNB's new investigation committee came from the University of Toronto, which had hosted this symposium. This detail establishes the direct link between Kuhn's presentations and UNB's reopened investigation.

Kuhn's own abstract admits that his views on the matter were formed entirely on media coverage, stating that his "references are all drawn from the (mainstream) media" and that he was "not aware of any academic publications on this topic." Yet he nonetheless endorsed allegations of fraud as credible and published them under his institutional academic credentials.

On July 31, 2023, Kuhn published an article titled "The Douglas Mastriano Scandal" in the journal *Canadian Perspectives on Academic Integrity*, Vol. 6, No. 1 (2023), an online journal published by the University of Calgary. The article repeated and amplified the false fraud allegations against Col. Mastriano, timed to coincide with and amplify the damage to his Senate candidacy.

Kuhn's conduct was not independent academic commentary. It was coordinated with the enterprise's ongoing effort to destroy Col. Mastriano's credentials. Kuhn's symposium presentation preceded the reconstitution of UNB's investigation committee, which then included a member from the very university

that had hosted Kuhn's event. Kuhn functioned as an external validation mechanism, using his credentials as a research officer and academic integrity expert to lend institutional credibility to what were, as alleged, fabricated fraud allegations.

As a direct and proximate result of Defendants coordinated conduct, Col. Mastriano suffered extensive and quantifiable economic harm. His scheduled speaking engagements were cancelled, depriving him of associated fees. Adjunct teaching positions and guest lecture opportunities withdrawn. Media consulting contracts that were in active negotiation were terminated or abandoned following Defendants' false allegations. Publishers notified him they would cease printing his books pending resolution of the allegations, destroying his book sales market.

Col. Mastriano suffered further harm in his political campaigns. His 2022 gubernatorial campaign was directly damaged by Defendants' false fraud allegations, which were weaponized by political opponents, resulting in declined fundraising, negative media coverage, and voter perception damage. His 2024 Senate frontrunner status was similarly undermined, ultimately causing him to forgo pursuing the Senate candidacy because of the election interference and reputational destruction. The total damages, including lost book sales, cancelled speaking engagements, terminated academic appointments, foregone media opportunities, and campaign harm, exceed $10 million.

## III.    STANDARD OF REVIEW

A complaint survives a Rule 12(b)(6) motion to dismiss if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal* at 678. The grant of a motion to dismiss is reviewed *de novo* and without deference to the trial court. *Lamson v. Montgomery Cnty.*, 460 Md. 349, 360, 190 A.3d 316, 323 (2018). Dismissal is appropriate only when "the complaint does not disclose, on its face, a legally sufficient cause of action." *Id.*

The plausibility standard does not require a plaintiff to plead "detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It requires only enough factual content to raise the claim above the "speculative level" and "nudge the plaintiff's claims across the line from conceivable to plausible." *Id.* at 555, 570. When ruling on a Rule 12(b)(6) motion, the Court must accept all well-pleaded factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and refrain from weighing the evidence or assessing the credibility of the allegations. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). The Court must consider those facts and inferences in the light most favorable to the plaintiff.

12

A complaint is not subject to dismissal merely because the court believes the plaintiff is unlikely to prevail on the merits. *Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002). On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing a prima facie case for jurisdiction. All well-pleaded factual allegations in the complaint are accepted as true, and any factual disputes are resolved in the plaintiff's favor. The plaintiff need not establish jurisdiction by a preponderance of evidence at the motion-to-dismiss stage. Rather, a prima facie showing is sufficient.

Kuhn's motion requires the Court to evaluate both the 12(b)(2) jurisdictional challenge and the 12(b)(6) merits challenge. Both standards require that the Court draw all reasonable inferences in Plaintiff's favor and accept as true all factual allegations in the Second Amended Complaint. Viewed through this lens, Kuhn's motion fails at every level.

## IV.    ARGUMENT

**A. This Court Has Proper Personal Jurisdiction Over Defendant Kuhn.**

Kuhn'' jurisdictional arguments rest on the false premise that because his physical activities occurred in Canada, and he is located there, this Court lacks proper authority over him. This premise ignores both the nature of the alleged conspiracy and the broad scope of RICO's service of process provision. Personal jurisdiction

over Kuhn is independently supported by RICO's nationwide service provision, the traditional minimum contacts analysis based on purposeful direction of tortious conduct, and principles of co-conspirator jurisdiction.

### 1. Kuhn Purposefully Directed Tortious Conduct Towards the United States and Oklahoma.

The traditional minimum contacts analysis supports jurisdiction. The Supreme Court has held that a court may exercise personal jurisdiction over a defendant where the defendant has "certain minimum contacts" with the forum such that the maintenance of the suit does not offend the traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Under the Tenth Circuit's purposeful-direction test, a defendant directs activity at a forum when he (1) commits an intentional act, (2) expressly aimed at the forum state, (3) with knowledge that the brunt of the injury will be felt there. *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 841 (10th Cir. 2020); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.,* 514 F.3d 1063, 1072 (10th Cir. 2008). Kuhn's conduct satisfies all three elements.

Kuhn's conduct was intentional. He deliberately drafted and submitted an article titled for public dissemination at a Canadian symposium and in an online journal accessible throughout North America. He deliberately chose to frame his

presentation as a case study in "academic fraud" endorsing prior allegations against Col. Mastriano. These were not inadvertent acts; they were calculated.

Kuhn's actions were expressly aimed at the United States and at Oklahoma. The Second Amended Complaint alleges that Kuhn coordinated his publication with co-conspirators including Gregory, who was an Oklahoma resident. The purpose of this coordination was not merely to advance academic discourse in Canada but to amplify, at a critical moment in Col. Mastriano's 2024 U.S. Senate campaign, false allegations of scholarly misconduct. Kuhn cannot credibly claim ignorance of the United States nexus when his publication explicitly discussed a controversy involving an American politician-academic and his dissertation, and was timed to coincide with that politician's prominent American political campaign. Kuhn's reliance on the Canadian-focused nature of the journal in which his abstract was published misunderstands the internet's reach. An online journal is, by definition, accessible to anyone anywhere in the world. The abstract described a controversy involving an American military officer who was at the time pursuing a U.S. Senate seat. There is nothing implausible about the allegation that the publication was designed to reach and harm Plaintiff in the United States, including in Oklahoma where Gregory resided and conspired.

Finally, Kuhn knew the brunt of the injury would be felt in the United States and in Oklahoma. Gregory, whom Kuhn discussed and endorsed in his own work, was

an Oklahoma resident. Col. Mastriano's professional reputation, publishing and speaking markets, and political activities are centered in the United States. By endorsing Gregory's allegations and broadcasting them to an online academic audience, Kuhn knew his conduct would damage Col. Mastriano's American business and political activities. He deliberately targeted his work with the intent to cause harm to Col. Mastriano in his campaigns for political offices in the United States.

Kuhn argues that because he physically submitted his abstract to a committee in Canada and spoke in Winnipeg, his conduct cannot have been directed at Oklahoma. This argument conflates physical location with the target of the harm. The Tenth Circuit has consistently rejected the notion that a defendant must physically set foot in the forum state for purposeful direction to exist. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985). What matters is whether the defendant directed harm at forum state residents, and Kuhn plainly did.

## 2. Exercising Jurisdiction Over Kuhn Comports with Due Process.

When a defendant purposefully directs conduct toward the forum, personal jurisdiction is presumed reasonable, and the burden shifts to the defendant to present a compelling case of unreasonableness. *Id.* at 477. While defending this action from Canada imposes some burden on Kuhn, modern discovery practices, including electronic discovery, videoconference depositions, and remote court appearances,

substantially mitigate the practical inconvenience of cross-border litigation. Oklahoma has a real interest in adjudicating conduct by its former resident Gregory and his alleged co-conspirators. Plaintiff has a compelling interest in litigating all members of the alleged conspiracy in a single forum to avoid inconsistent judgments and duplicative litigation. Judicial economy strongly favors a single consolidated proceeding. These factors, viewed through the Tenth Circuit's sliding-scale lens, weigh in favor of jurisdiction. *Dental Dynamics v. Jolly Dental Group LLC,* 946 F.3d 1223, 1229 (10th Cir. 2020).

Under RICO's Fifth Amendment due process analysis, jurisdiction is improper only where the forum presents "constitutionally significant inconvenience." *Klein v. Cornelius*, 786 F.3d 1310, 1318 (10th Cir. 2015). Kuhn's arguments fall well short of the heavy burden required to establish a constitutional inconvenience of that magnitude. The federal interest in adjudicating a claimed RICO conspiracy in a single forum far outweighs the marginal burden Kuhn would bear in defending himself in this jurisdiction.

### 3. Col. Mastriano's Co-Conspiratory Theory Independently Supports Jurisdiction.

The Second Amended Complaint pleads a prima facie case that Kuhn participated in a conspiracy that included Gregory, an Oklahoma resident. The Tenth Circuit has held that acts taken in the forum by one member of a conspiracy may be attributed

17

to other conspirators for purposes of establishing personal jurisdiction where the plaintiff plausibly alleges a conspiracy and substantial steps in furtherance of that conspiracy occurred in the forum. *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007). The conspiracy was directed at the United States and at Col. Mastriano's activities in this countr. Gregory took substantial steps in furtherance of the conspiracy from his Oklahoma residence. This independently provides a basis for jurisdiction over Kuhn.

Kuhn's assertion that the Second Amended Complaint fails to plead a "meeting of the minds" between himself and any co-defendant mischaracterizes the pleading standard at the Rule 12(b)(2) stage and disregards the Second Amended Complaint's allegations in their proper context. The Second Amended Complaint alleges that Kuhn's article and symposium presentation were timed and framed to coincide with and reinforce a broader coordinated campaign involving Gregory and others. At the motion-to-dismiss stage, these allegations are taken as true, and a reasonable inference of coordination is all that is required.

### 4. RICO's "Ends of Justice" Standard Confers Jurisdiction.

RICO's service of process provision, 18 U.S.C. § 1965(b), authorizes nationwide service of process on defendants in any district where "it is shown that the ends of justice require that other parties residing in any other district be brought before the court." The Tenth Circuit has held that nationwide jurisdiction under § 1965(b)

18

exists where two conditions are met. First, the court has personal jurisdiction over at least one defendant under § 1965(a). Second, the ends of justice require that other defendants be brought before the same court. *Cory v. Aztec Steel Building, Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006). The ends of justice are satisfied here because the alleged RICO enterprise involves multiple defendants residing in different districts, and requiring Plaintiff to pursue separate actions in multiple courts would frustrate the efficient and comprehensive adjudication that RICO is designed to permit.

Kuhn contends that Plaintiff's Second Amended Complaint is "devoid of any facts" showing the ends of justice require his presence here. This overstates the pleading burden and misreads Tenth Circuit precedent. The Tenth Circuit has explained that the ends of justice standard is "flexible" and does not require a plaintiff to plead detailed particularized facts beyond what is required to state a RICO claim. *Cory* at 1230. The Second Amended Complaint more than satisfies this threshold.

Both conditions are satisfied in this case. This Court has undisputed personal jurisdiction over Defendant Gregory, who resided in Oklahoma during the relevant period and whose activities form the nucleus of the alleged conspiracy. Second, the ends of justice plainly require bringing Kuhn before this Court alongside his co-conspirators. This case involves an alleged coordinated campaign among multiple defendants spread across multiple countries, over multiple years, targeting an

19

American political candidate's academic credentials in order to with his political campaigns. Trying Kuhn separately from his co-conspirators would risk inconsistent factual findings about whether the conspiracy existed, who participated in it, what predicate acts were committed, and what damages flowed from them. It would impose enormous duplicative burdens on Col. Mastriano and on judicial resources.

Kuhn was not a peripheral figure in this conspiracy. As alleged in the Second Amended Complaint, Kuhn's published abstract and symposium presentation served the specific function of being the veneer of international academic validation to what were, in fact, false and malicious allegations against Col. Mastriano. The enterprise required Kuhn's participation precisely because Gregory, the primary instigator, lacked institutional credibility of his own. Kuhn provided that confirmation. His role was integral to the conspiracy's ability to achieve its purpose, and the ends of justice require adjudicating his role alongside his co-defendants.

## B. Col. Mastriano Has Standing to Pursue Claims Under RICO and the Sherman Act.

Kuhn argues that Col. Mastriano lacks the requisite standing under RICO and the Sherman Act because he alleges only "intangible" injuries, and because causation is insufficiently pled. These arguments fundamentally mischaracterize both the Second Amended Complaint's allegations, the applicable legal standards, and the facts of this case.

## 1. Concrete Injury to Business and Property are Asserted.

RICO's civil remedies provision grants a private right of action to any person "injured in his business or property by reason of" a RICO violation. 18 U.S.C. § 1964(c). The Clayton Act similarly grants a right of action to persons injured in their "business or property" by antitrust violations. 15 U.S.C. § 15(a). Both statutes require the same showing of concrete injury. *Tal v. Hogan*, 453 F.3d 1244, 1254 (10th Cir. 2006).

The Second Amended Complaint alleges concrete economic injuries. Col. Mastriano lost book sales and royalty income flowing from the reputational destruction wrought by Defendants' false fraud allegations. He alleges lost speaking engagements and teaching opportunities. He alleges that media and publishing contracts in active negotiation were terminated when Defendants' false allegations became public. These are all tangible injuries to business and property, not mere dignitary or reputational harms. Lost income, lost contract opportunities, and lost royalties are textbook "business or property" injuries under both RICO and the Sherman Act. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Kuhn's attempt to characterize these injuries as "intangible" ignores the Second Amended Complaint's actual allegations. While Col. Mastriano also alleges reputational injury, those allegations are accompanied by, and support, actual concrete economic loss. The presence of reputational injury does not transform the economic losses into impermissible claims.

## 2. Col. Mastriano's Injuries are Directly Traceable to Kuhn's Conduct.

Kuhn argues that the causal chain linking his specific conduct to Plaintiff's injuries is too attenuated. This argument misunderstands how causation operates in conspiracy cases and mischaracterizes the Second Amended Complaint's causal allegations.

As a foundational matter, in a conspiracy case a defendant may be held liable for injuries caused by acts of co-conspirators taken in furtherance of the conspiracy, not merely those resulting from his own individual conduct. *Salinas v. United States*, 522 U.S. 52, 63–65 (1997). A defendant may be liable for a RICO conspiracy even if he did not personally commit the predicate acts, so long as he knowingly agreed to facilitate the enterprise's unlawful scheme. *Id.* The Second Amended Complaint alleges that Kuhn joined and participated in a conspiracy alongside Gregory, UNB defendants, and others to destroy Col. Mastriano's reputation and interfere with his elections. Kuhn is therefore liable for all injuries caused by the conspiracy.

22

Even evaluated on an individual basis, the causal chain from Kuhn's specific conduct to Plaintiff's injuries is straightforward. Gregory made false allegations about Col. Mastriano's dissertation. UNB opened investigations and created a record of institutional concern. Kuhn then published an article and delivered a public symposium presentation affirming the credibility of those allegations and framing them as a documented "scandal." Media outlets, publishers, and voters relied on Kuhn's independent academic endorsement to conclude the allegations were credible. Contracts were terminated and negotiations ceased. This is not a remote or speculative chain of causation; it is a direct and foreseeable sequence.

Kuhn's reliance on *Hemi Group* is misplaced. Hemi Group concerned an intervening third-party actor whose independent decision broke the causal chain. *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010). This case presents a different set of facts and circumstances. The Second Amended Complaint alleges that both media outlets and the public relied on Kuhn's endorsement in evaluating the credibility of the fraud allegations. This is what Kuhn intended when making his statements and publications. There is no independent intervening actor breaking the chain. Kuhn worked alongside the co-defendants to accomplish a shared goal and destroy Col. Mastriano's political and academic ambitions.

### 3.  The Injuries Suffered Are Redressable.

23

Col. Mastriano seeks monetary damages, declaratory relief, and injunctive relief. Each form of relief would meaningfully redress a distinct category of harm he has suffered, and the availability of even a partial redress is sufficient to satisfy the redressability element of standing.

Monetary damages would directly compensate Col. Mastriano for the quantifiable economic losses he has suffered. This includes lost book royalties, cancelled speaking fees, withdrawn teaching and consulting opportunities, and terminated media contracts. The monetary damages include treble damages available under RICO and actual damages under the Sherman Act and state law These are not speculative future harms; they are past and ongoing economic injuries capable of being calculated and compensated through a money judgment.

Declaratory relief would serve a distinct and independent redressive function. A declaration that the fraud allegations against Col. Mastriano are false, and that his PhD was properly earned, would restore his standing in the academic and publishing communities. Many of the downstream harms he has suffered flow directly from the uncorrected public record created by Defendants' false allegations. A declaratory judgment correcting that record would meaningfully redress those reputational and commercial harms.

Injunctive relief would prevent the continuation and future repetition of the injurious conduct. To the extent Kuhn or other Defendants continue to disseminate,

24

republish, or otherwise promote the false fraud allegations against Col. Mastriano, an injunction would halt that ongoing harm. Redressability does not require that relief make a plaintiff entirely whole; it requires only that the requested relief would meaningfully address the injury. *Massachusetts v. EPA*, 549 U.S. 497, 525–26 (2007). The combination of damages, declaratory relief, and injunctive relief plainly satisfies that standard. Kuhn raises no serious challenge to redressability, and for good reason.

## C. The Second Amended Complaint Properly Pleads RICO and RICO Conspiracy Claims.

Kuhn argues that the Second Amended Complaint fails to plead predicate acts of racketeering activity, a pattern of such activity, or a RICO enterprise involving him as a defendant. Each argument fails on its face.

### 1. The Second Amended Complaint Adequately Alleges a Pattern of Racketeering Activity.

RICO defines "racketeering activity" to include mail fraud and wire fraud. 18 U.S.C. § 1961(1). Mail fraud and wire fraud require: (1) a scheme to defraud; (2) use of the mails or interstate wires in furtherance of the scheme; and (3) intent to defraud. 18 U.S.C. §§ 1341, 1343. The Second Amended Complaint adequately alleges all three elements in connection with the enterprise's overall scheme and with Kuhn's specific participation.

Kuhn argues that his specific conduct does not constitute racketeering activity because it does not involve the United States mails or interstate wires. This argument has two independent answers. The online journal in which Kuhn's publication appeared is hosted on the internet and was accessible to, and was in fact accessed by, persons in the United States. Publication of a false and defamatory article through an internet platform accessible across the United States constitutes use of interstate wires within the meaning of the wire fraud statute. The publication of Kuhn's work served as an interstate wire transmission in furtherance of the scheme to defraud Col. Mastriano of his intangible property interests.

Even if Kuhn's own specific acts did not themselves constitute predicate acts under the wire fraud statute, his participation in the RICO conspiracy does not require that he personally execute each predicate act. 18 U.S.C. § 1962(d). RICO conspiracy liability only requires that Kuhn knowingly agreed to participate in a conspiracy that involved the commission of predicate acts by co-conspirators, and that at least two such predicate acts were committed. *Salinas* at 65. The Second Amended Complaint alleges ten specific emails constituting wire fraud committed by other co-conspirators, none of which Kuhn claims he was unaware. Kuhn is personally liable for those predicate acts as a co-conspirator.

Kuhn's argument that he is "excluded" from the specific paragraphs detailing particular emails sent by other defendants is no basis for dismissal. In a RICO

conspiracy, each conspirator is liable for predicate acts committed in furtherance of the conspiracy even if he did not personally send or receive the specific communications. *Tal* at 1269. The Second Amended Complaint alleges Kuhn's knowing participation in the broader scheme, and that is sufficient.

While Kuhn argues that FRCP Rule 9(b)'s particularity requirement is not satisfied as to him personally, the Rule 9(b) standard does not require that every detail be pled with absolute precision before discovery.  Fed. R. Civ. P. 9(b). The Second Amended Complaint identifies the specific statements Kuhn made, he specific publication in which they appeared, the approximate timing of when the statements were made, and the connection of those statements to the broader fraudulent scheme. That level of particularity satisfies Rule 9(b)'s purpose of providing Kuhn notice of the claims against him. *Tal* at 1263.

**2.  The Second Amended Complaint Adequately Alleges a RICO Enterprise.**

A RICO enterprise is established by a showing of a common purpose, relationships among those associated with the enterprise, and sufficient longevity to pursue the purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009). The enterprise need not be formal, hierarchical, or have a leader. *Id.* at 945. It need only be shown that participants functioned as a continuing unit. *Id.* at 948.

Here, the enterprise had a defined common purpose, which was to destroy Col. Mastriano's academic credibility, political campaigns, and PhD property interests

through coordinated false allegations of fraud. This is a concrete and specific purpose. The Second Amended Complaint also alleges detailed relationships among the enterprise members. Gregory filed complaints with UNB. UNB faculty opened and managed investigations. Kuhn endorsed and validated those investigations through his publications and public statements. This establishes a network of associated actors functioning together toward a common fraudulent end. The conspiracy operated from 2019 through 2023; a period spanning four years and multiple election cycles. This easily satisfies the longevity requirement.

Kuhn argues that the Second Amended Complaint fails to allege he "conducted the enterprise's affairs" as required by 18 U.S.C. § 1962(c). However, Kuhn's publications and public statements were not purely independent acts divorced from the enterprise. Kuhn's endorsement of Gregory's allegations was coordinated with and designed to reinforce the broader campaign. An enterprise participate need not occupy a leadership role in the enterprise to satisfy RICO's "operation or management" requirement. Liability extends to participants who knowingly carry out or facilitate the enterprise's affairs under the direction of those managing it. *Reves v. Ernst & Young*, 507 U.S. 170, 179, 184 (1993); *Brannon v. Boatmen's First National Bank of Oklahoma*, 153 F.3d 1144, 1146 (10th Cir. 1998).

**D. The Second Amended Complaint States a Viable Claim Under § 1 of the Sherman Act.**

28

Kuhn argues that the Second Amended Complaint fails to state claim under the Sherman Act because academic discourse about a historian's work cannot constitute an anticompetitive restraint of trade. This argument mischaracterizes both the allegations in the Second Amended Complaint and the reach of § 1 of the Sherman Act.

### 1. Using Fraud to Eliminate Competition is Anti-Competitive Conduct.

The Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. This prohibition is not limited to price-fixing or market allocation schemes. It reaches any concerted action that unreasonably restrains competition in a relevant market. The relevant market here is the market for World War I military history scholarship, which encompasses book sales, speaking engagements, media contracts, teaching and consulting opportunities, and related commercial activities. *Tal* at 1261.

The Second Amended Complaint does not challenge legitimate academic commentary. It challenges a coordinated, fraudulent scheme to destroy a competitor's market participation through false allegations of fraud. Defendants, including Kuhn, conspired to eliminate Col. Mastriano as a viable competitor in this market by fabricating and amplifying false fraud allegations at a time when his academic credentials were under media scrutiny. Fraud that eliminates competitors

does not advance the competitive process; it subverts it. This is classic anticompetitive conduct.

Kuhn argues that introducing more books and more speakers into the historical market is pro-competitive, not anticompetitive. This argument would be persuasive if the Second Amended Complaint alleged competition on the merits. Rather, it alleges the opposite that Defendants did not out-compete Col. Mastriano through superior scholarship but rather drove him from the market through fabricated misconduct allegations. Competition through fraud is not pro-competitive; it is precisely the harm the antitrust laws prohibit. Lawful competition is healthy and welcomed. Unlawful targeting to drive competition out of the marketplace is not.

## 2. Col. Mastriano Suffered an Antitrust Injury.

Antitrust injury must be of the type of the antitrust laws were intended to prevent and must flow from conduct that makes defendants; acts unlawful. *Brunswick Corp.* at 489. The Second Amended Complaint alleges exactly such injury. The exclusion from the WWI history market not by legitimate competition, but by coordinated fraud. This is injury to the competitive process itself, not merely injury to Col. Mastriano as an individual.

The Second Amended Complaint alleges harm both to Col. Mastriano and to the competitive process, including consumers. Consumers of WWI history scholarship were deprived of access to Col. Mastriano's books, research, lectures, and

30

scholarship because of false information distributed to them. Harm to consumers is the quintessential antitrust injury, distinct from any personal injuries Col. Mastriano suffered.

Kuhn's argument that the Second Amended Complaint's tying-arrangement allegation fails because a PhD complaint is not a "product" misses the point of the allegation entirely. Defendants used the institutional leverage of academic fraud allegations to force the market to reject Col. Mastriano's commercial work. This is a tying mechanism in substance itself, if not in the classic product-market form. At the pleading stage, these allegations state a plausible antitrust claim.

**E. The Defamation Claim is Plausible Alleged and Survives Oklahoma Citizens Participation Act Review.**

Kuhn's defamation arguments rest on three flawed premises. First, that the Oklahoma Citizens Protection Act ("OCPA") shields his statements from liability. Second, that his characterizations of Col. Mastriano constitute protected opinion rather than actionable fact. Third, that the Second Amended Complaint fails to plead actual malice or damages with sufficient specificity.

Each of these premises fail. Kuhn published specific, verifiable false statements of fact as part of a coordinated scheme to destroy his reputation and market position. This false statement was that Col. Mastriano's thesis contained fraud, that his PhD was awarded under suspicious circumstances, and that he participated in an invasion

of the United States Capitol. These statements were published to third parties, and caused Col. Mastriano concrete economic harm. The OCPA does not immunize knowing falsehoods deployed in furtherance of a fraudulent conspiracy, and the Second Amended Complaint's allegations satisfy every element of defamation under Oklahoma law, including the heightened actual malice standard applicable to public figures.

## 1. Kuhn's Statements are Actionable and Not Protected by the OCPA.

The OCPA creates a special motion to dismiss for suits "based on, relat[ing] to, or in response to" a party's exercise of free speech. 12 O.S. § 1432(A). Its burden-shifting framework requires the defendant first to show by a preponderance that the suit relates to protected speech. If the burden is met, it then shifts to the plaintiff to establish by "clear and specific evidence" a prima facie case for each essential element of the defamation claim. *Id.* at § 1434(C)-(D). The first-step burden does not insulate knowingly false statements made as part of a fraud conspiracy.

The OCPA protects legitimate free speech. It does not immunize statements made with knowing falsehood as part of a coordinated scheme to harm another person. The right of free speech has never encompassed the right to defame with actual malice. Kuhn's invocation of OCPA protection presupposes the very thing that is in dispute; whether his statements were legitimate expressions of academic opinion or

knowing falsehoods made to further a fraudulent enterprise. That is a question of fact unsuitable for resolution at the pleading stage.

Even accepting that the OCPA applies, its protections are stronger when a plaintiff is a public figure, but do not eliminate liability where actual malice is shown. *Yates v. Gannett Co., Inc.,* 523 P.3d 69, 75 (Okla. Civ. App. 2022). The Second Amended Complaint alleges facts sufficient to establish actual malice, and the OCPA at most requires Col. Mastriano to establish a prima facie case. The Second Amended Complaint satisfies this standard.

### 2.  Col. Mastriano's Defamation Allegations are Sufficient.

To state a proper claim of defamation, a plaintiff must allege (1) a false statement; (2) published to a third party; (3) by the defendant; (4) that caused injury to the plaintiff. *Yates* at 76. Because Col. Mastriano is a public figure, he must also allege that Kuhn acted with actual malice, which is either knowledge of falsity or reckless disregard for truth. *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964). The Second Amended Complaint satisfies each element of this higher standard.

Kuhn made three specific categories of statements. First, that Gregory is a "respected historian" who found multiple instances of fraud in Col. Mastriano's thesis; The second category is a series of statements that UNB awarded Col. Mastriano's PhD under "unusual circumstances." Finally, Kuhn made statements

directed at Col. Mastriano as an individual, calling him a fraud and a participant in "an invasion of the U.S. Capitol."

These are not matters of protected opinion. Alleging that Gregory "found multiple instances of fraud" asserts a concrete factual conclusion. Kuhn's further statements imply factual improprieties and factual mischaracterizations of conduct. Whether statements constitute actionable fact versus protected opinion is generally a question for the jury, not a question of law to be resolved on a motion to dismiss. At the pleading stage, these allegations sufficiently describe statements of fact capable of being proven false.

The Second Amended Complaint alleges these statements are false. Col. Mastriano properly conducted his research, properly cited his sources, and properly earned his PhD. The investigations UNB opened were designed to create the appearance of impropriety, not to investigate actual misconduct. Kuhn's endorsement of the allegations as "credible" and his characterization of the situation as a "scandal" are inherently false.

Kuhn argues that the Second Amended Complaint does not expressly his statements were made with actual malice, and notes that Col. Mastriano added such an allegation against Gregory but not against Kuhn. This hyper-technical argument fails. The Second Amended Complaint describes how Kuhn's statements were part of a coordinated fraudulent scheme to harm Col. Mastriano. A person who makes

false statements as part of a conspiracy to harm the subject of those statements, at a minimum, acts with reckless disregard for truth, and likely with full knowledge of falsity. At the pleading stage, the Second Amended Complaint's conspiratorial framework supplies the factual predicate for an actual malice inference.

Even if the Second Amended Complaint does not use the talismanic phrase "actual malice" with respect to Kuhn, notice pleading does not require specific wording. The allegations that Kuhn coordinated with Gregory, knew of the falsity of his underlying allegations, and deliberately framed his publication as a case study in "academic fraud" are sufficient to plausibly allege knowing or reckless falsity.

Kuhn also argues that the Second Amended Complaint fails to connect his statements to Plaintiff's alleged damages. However, the Second Amended Complaint specifically alleges that Kuhn's publication amplified the false fraud narrative at a critical time, contributing to media coverage, loss of publishing and media opportunities, and reputational harm in Plaintiff's professional market. These are sufficient damage allegations for the pleading stage, and are detailed both in the Second Amended Complaint and this brief.

### 3. Col. Mastriano's False Light Claim Independently Survives.

Kuhn argues that Col. Mastriano's false light invasion of privacy claim should be dismissed as duplicative of the defamation claim. While the two claims overlap factually, they are legally distinct. False light invasion of privacy provides an

independent cause of action for statements that place the plaintiff in a false light before the public, even where the statements may not satisfy every element of defamation. The Second Amended Complaint adequately alleges each element of false light: Kuhn made statements that were materially false, that placed Col. Mastriano in a false light before the public, and that a reasonable person would find highly offensive. For the same reasons the defamation claim survives, the false light claim survives as well.

False light is an independent privacy tort under Oklahoma common law. It is also jurisdictionally critical. Count Ten is the basis for this Court's supplemental jurisdiction over Col. Mastriano's state-law claims under 28 U.S.C. § 1367. To satisfy a claim of false light, a Plaintiff must show (1) publicity given to a matter; (2) that placed plaintiff in a false light; (3) is highly offensive to a reasonable person; and (4) actual malice. *Yates* at 77. The Second Amended Complaint pleads each element with clarity and specificity. Under Oklahoma law, the publicity element under a false light invasion of privacy claim requires that the defendant communicate the false matter "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of general public knowledge." *Restatement (Second) of Torts* § 652D cmt. A. Kuhn's conduct satisfies this standard several times over.

36

The "highly offensive" standard requires that the false light "would be objectionable to a reasonable person under the circumstances." *Restatement (Second) of Torts* § 652E cmt. c. False light liability arises where a publication falsely portrays a person in a manner that would be highly offensive to a reasonable reader. *Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 248 (1974). The false light alleged here is not a minor mischaracterization, but ultimately a trivial error. Gregory told national audiences that a retired Army colonel, sitting state senator, and published historian was a fraud who fabricated historical documents and lied about his sources. All of which occurred during a time that same senator was running for governor and considering a run for U.S. Senate. A reasonable person would find it highly offensive to have those characterizations broadcast nationally during an election campaign. The faculty letter went further still. The offensive nature of these portrayals is not a close question.

For false light claims, actual malice means knowledge of or reckless disregard for the false light in which the plaintiff was placed. It does not mean mere knowledge of falsity of individual statements. *Cantrell* at 250. The Second Amended Complaint easily satisfies this standard.

Kuhn's article titled, "The Douglas Mastriano Scandal" and his symposium presentation placed Col. Mastriano before a public academic and media audience in the false light of a fraudster. Kuhn framed him as a scholar who fabricated citations,

obtained his PhD through irregular means, and participated in an assault on the United States Capitol. These are not merely unflattering characterizations; they are false portrayals of criminal and professional misconduct that strike at the core of Col. Mastriano's identity as a decorated military officer, a credentialed historian, and a public servant. A reasonable person would find that kind of malicious portrayal highly offensive. As alleged throughout the Second Amended Complaint, Kuhn did not arrive at these characterizations through independent investigation. He admitted himself that his entire analysis was drawn from media coverage, yet nonetheless published them under his institutional academic credentials as part of a coordinated scheme to harm Col. Mastriano. This conduct reflects, at minimum, reckless disregard for the truth, and plausibly reflects knowing falsity, satisfying the actual malice standard required of claims brought by public figures.

## F.  Dismissal With Prejudice Would be Improper.

Kuhn urges the Court to dismiss the Second Amended Complaint against him with prejudice on the ground that Col. Mastriano has already amended twice and still cannot state a claim. This argument is contrary to the applicable standard. The FRCP provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). Dismissal with prejudice is appropriate only where amendment would be futile, where there has been willful failure to cure after notice,

or where the opposing party would suffer undue prejudice. *Bylin v. Billings,* 568 F.3d 1224, 1229 (10th Cir. 2009). None of those conditions are satisfied here.

As demonstrated above, the Second Amended Complaint states plausible claims against Kuhn on multiple grounds. Dismissal with prejudice is therefore inappropriate as a matter of law because the Court should not dismiss with prejudice when the operative complaint states a claim. Even if this Court were to find any residual pleading deficiency, Col. Mastriano has identified in verified declarations and supporting materials additional facts not yet incorporated into the Second Amended Complaint that could cure any such deficiency. Amendment would not be futile.

Kuhn would suffer no undue prejudice from amendment. This case is still in its early stages, no discovery has been taken, and no trial date has been set. Permitting Plaintiff to amend would not impose any unreasonable burden on Kuhn. Accordingly, should the Court identify any deficiency in the Second Amended Complaint, Col. Mastriano respectfully requests leave to amend under FRCP Rule 15(a)(2) to cure any such deficiency.

## V.    CONCLUSION

WHEREFORE, based on the reasoning above, Col. Mastriano respectfully requests this Court to Deny Kuhn's Motion to Dismiss and Brief in Support and to grant Col. Mastriano leave to amend the Complaint to the extent of any insufficiency.

Respectfully submitted,

The Cox Law Center, LLC
By:
_____/s/_____
Daniel L. Cox, OKWD Bar 2490
Attorney for Plaintiff
The Cox Law Center, LLC
P.O. Box 545
Emmitsburg, MD 21727
Ph: 410-254-7000
Fx: 410-254-7220
E-mail: dcox@coxlawcenter.com

## VI.    CERTIFICATE OF SERVICE

This is to certify on this 16th day of March 2026, that a copy of the foregoing was served on counsel of record via CM/ECF.

_____/s/_____
Daniel L. Cox